TUDOR WOODBRIDGE & Co. *against* TIMOTHY P. PERKINS.

**In the assignment of a book debt, notice to the debtor is indispensable; for until such notice is given, the property remains in the assignor's possession, and is liable for his debts.**

MOTION for a new trial.

This was a *scire facias* against the defendant, as the agent, attorney, factor, trustee and debtor of *John T. Duryee,* of *New-York,* an absent and absconding debtor.

The defendant pleaded, that he was not the agent, &c. of said *John T. Duryee,* nor had he any effects of said *Duryee* in his hands.

On the trial to the jury, it appeared, that the plaintiffs left a copy of their writ against *Duryee* with the defendant on the 11th of *October,* 1806. Prior to the 21st of *July,* 1806, the defendant was indebted to *Duryee,* on book, to a larger amount than the plaintiffs' claim. On that day, *Duryee* executed a deed of assignment of his debt against the defendant to *Joshua Waddington* and *James Thompson* of *New-York,* as security for a large debt due to them, with a power of attorney to collect and receive the money. The defendant had no notice of the assignment until the 13th of *October,* 1806, two days after he was served with a copy of the plaintiffs' writ. Under these circumstances, the plaintiffs contended, that the assignment was ineffectual, and they were entitled to recover. *Waddington,* in the name of the defendant, insisted that the assignment was sufficient to protect his interest in the debt against the claim of the plaintiffs. The court decided, and so instructed the jury, that the plaintiffs were entitled to recover, on the ground that the defendant had no notice of the assignment until after service of the plaintiffs' pro-

cess; and, therefore, directed them to find a verdict for the plaintiffs; which they accordingly did.

The defendant then moved for a new trial, on the ground of a misdirection; and the court reserved the question for the consideration of the nine judges.

*N. Smith* and *Bristol*, in support of the motion.

There is no question as to the power of *Duryee* to transfer his interest in this debt to another; nor is it denied, that the instrument executed for this purpose was appropriate and legal in its form. Why, then, did not the property vest immediately in the assignees? Because, it is said, that no notice was given to the debtor. But could not the property *pass* without such notice? Is notice an essential part of the transfer? There can be but two parties to the transfer; the party who makes it, and the party to whom it is made. It is a contract between them, and them only. When *their minds meet*, the contract is formed. It is not pretended, that the debtor is entitled to any voice in the transaction. His assent is not requisite. The transfer depends solely upon the deed of assignment. The want of notice only leaves it in the power of the assignor to deprive the assignee of any benefit of the assignment. The debtor will be protected in payment to his original creditor, so long as he is ignorant that any one else is entitled to receive payment. It will, therefore, be prudent for the assignee to give notice for his own security; (*Jones* v. *Gibbons*, 9 *Ves.* jun. 410.) but the transfer has taken place, when the notice is given. This is implied in the very notice given; which is, that the debt *has been assigned.*

Further, if notice be an essential part of the contract, the assignee could not hold until notice given, though

June, 1809.

WOOD-
BRIDGE
v.
PERKINS.

there should be no *laches* in giving notice. The assign-ment, in this case, was made in *New-York*, on the 21st of *July*. Suppose the assignees had immediately des-patched a messenger with notice to *Perkins;* but before he could possibly arrive at *Hartford*, though subsequent to the assignment, the creditors of *Duryee* had attached this debt. Upon the principle contended for, they would hold against the assignees. This, we apprehend, would be going great lengths.

In *Unwin* v. *Oliver*, cited 1 *Burr*. 481, no notice was given, and yet the transfer was held good. The same observation is applicable to *Winch* v. *Keeley*, 1 *Term Rep*. 619. The replication in that case does not state that any notice was given. In *Ryall* v. *Rolle*, 1 *Atk*. 165, the conveyance was not impeached on the ground of want of notice.

The argument derived from the plaintiffs' having the legal title proves too much: It proves, that they would hold *after* notice given; for *Duryee* still has the legal title. The suit for the debt must be brought in his name after notice as well as before.

Have the plaintiffs disclosed any facts, by which they show, that this transfer was *fraudulent* as against them? We do not controvert the position, that a sale of per-sonal property, which is left in the possession of the vendor, is fraudulent. But there is no analogy between that class of cases and this. As to personal property, the reason of the rule is, from *Twyne's* case in *Coke*, to the 9th of *East*, that leaving it in the possession of the vendor is an *actual fraud:* It deceives creditors. But here *Duryee* did not exercise any acts of ownership over the debt after the assignment. He deceived, and could deceive, no one. The case is as free as any case can be from actual fraud. The direction of the court

4

goes this length—that in every possible case of an assignment of a debt, notice must be given to the debtor, as soon as the relative situation of the parties will admit of, or the assignment will be fraudulent as against the creditors of the assignor. To vindicate this direction, it must be shown, that the omission to give notice is a fraud *per se*. But want of notice, *ex natura rei*, is at most a *fact* from which fraud is to be inferred. Whether there was fraud, or not, in any transaction, must necessarily be a question of fact. In cases of fraudulent conveyances, the several *badges* of fraud do not constitute fraud *per se*. The statute 21 *Jac.* I. c. 19. s. 11. makes the *possession* of property by the bankrupt, of which he is the reputed owner, and over which he exercises acts of ownership, subject to the disposition of the commissioners, as though it were the property of the bankrupt. This provision would have been unnecessary, if the statute of 13 *Eliz.* had rendered such possession a fraud *per se*. Even in *Edwards* v. *Harben*, 2 *Term Rep.* 587. which carried the rule to its extent, it was admitted, that the nature of the possession may be *explained*. This shows, that it is only a *badge* of fraud. It is the constant practice of judges at *nisi prius*, in cases of possession, after an absolute sale, to leave it to the jury *as a question of fact*, whether there was fraud in the transaction. Thus did Lord *Eldon*, in *Kidd* v. *Lawlinson*, 3 *Esp.* 52. and the jury finding that there was no fraud *in fact*, gave a verdict for the plaintiff, which the court of *common pleas* afterwards refused to set aside. 2 *Bos. & Pull.* 59. In *Hoffman* v. *Pitt*, 3 *Esp.* 22. Lord *Ellenborough* said, the not taking possession was, in some measure, indicative of fraud, but was not conclusive. To make it absolutely void, there must be something, that showed the deed fraudulent in the concoction of it.

Again, can the court say what is *reasonable notice*

from *New-York* to *Hartford?* This, also, is a question of *fact?* What if some accident has intervened? What is reasonable notice is never a question of law, except with regard to bills of exchange; and that exception rests upon mercantile principles.

*Daggett* and *S. Smith*, contra.

It is a general rule of law, that a sale of personal property, though upon good consideration, is fraudulent and not valid, as against the creditors of the vendor, unless the contract of sale is accompanied and followed by transfer of possession to the vendee : possession being the only mark, by which the ownership of goods can be known. The same *policy* from which originated the law requiring that transfers of real property should be rendered notorious by the delivery and recording of deeds, would also seem to require that the sale of personal things should be attended with as much notoriety as is practicable, without subjecting such transactions to an inconvenient restraint; since it is equally necessary in the one case, as in the other, to guard against those impositions which might be practised, by reason of a false appearance of wealth.

In the present case, we will inquire, if such be the general rule, to what extent it is applicable to contracts respecting the sale of personal things; and whether assignments of *choses in action* are not comprehended within the same rule ; so far it can be made to operate, at once, on things in possession, and things merely in action. And also, whether this case can justly be excepted from the operation of the rule, upon any principle which has yet been established.

As to the existence of the rule. It was resolved in *Twyne's* case, 3 *Co.* 80. that the gift there in question had divers marks of fraud, among which were " *that*

the donor continued in possession, using the goods as his own;" and that " there was a trust between the parties; for that the donor possessed all, and used them as his proper goods." Lord *Coke* adds, as a caution to purchasers, " immediately after the gift, take possession of them; for continuance of the possession in the donor is a sign of trust." In the case of *Ryall* v. *Rolle,* 1 *Atk.* 165. it was determined, that a conditional sale by one to his partner, of his moiety of the joint stock, was void, as against the creditors of the vendor; because the vendor, after the sale, was permitted to continue in appearance the partner of the vendee. The general doctrine of the necessity of changing possession is likewise clearly supported by Lord *Mansfield,* in *Worseley* v. *Demattos,* 1 *Burr.* 467. and is directly established in *Edwards* v. *Harben,* 2 *Term Rep.* 587. in which the defendant took from *A.* a bill of sale of certain goods, taking possession of some trifling article in the name of the whole, but agreeing to leave the goods in the actual possession of *A.* for fourteen days; within which period *A.* died. At the end of that time, the defendant took possession of the goods. This action was brought against him, as executor *de son tort;* and sustained, on the ground that *A.'s* continuing in possession was inconsistent with the deed, and fraudulent. On the same principle was the decision of *Bamford* v. *Baron,* 2 *Term Rep.* 594. *in notis,* and of *Paget* v. *Perchard,* 1 *Esp.* 205. These cases, indeed, except perhaps the last, arose upon the construction of the statutes of 13 *Eliz.* and 21 *Jac.* I. But the statutes of *Eliz.* have been considered declaratory of the common law. And in *Ryall* v. *Rolle,* *Burnet,* J. said, that such contracts were held to be fraudulent at common law; and Chief Baron *Parker,* that fraudulent deeds might be avoided at common law. Above all, we have the opinion of Lord *Mansfield* in *Cadogan* v. *Kennet,* *Cowp.* 434. that " the principles and rules of the common law, as now universally known and

*understood, are so strong against fraud in every shape,
that the common law would have attained every end pro-
posed by the statutes* 13 *Eliz.* c. 5. *and* 27 *Eliz.* c. 4." In
the supreme court of the *United States*, the same prin-
ciple has been adopted, and the authority of *Edwards* v.
*Harben* recognised, in *Hamilton* v. *Russell*, 1 *Cranch*,
309. But it is said, in support of the rule, that the re-
taining of possession by the vendor is not, *per se*, fraud,
but only evidence of fraud. Though the contrary doc-
trine was held in the case cited from *Cranch;* yet, if we
admit this, it will not at all oppugn the general princi-
ple contended for; since every equivocal fact may be
explained, to show its precise nature and tendency; al-
though, in the cases now under consideration, the facts
will be fixed by the *prima facie* evidence respecting
them, unless particular circumstances are proved, in
order to except them from the operation of the general
rule. The position is not, however, true in the extent;
for until this explanation is made, a sale without pos-
session is holden to be fraudulent in point of law. [See
2 *Term Rep.* 596. See also 1 *Cranch*, 318.] These ex-
ceptions form a separate class of cases, wholly distin-
guishable from those before cited, and from that now
before the court; and will serve to show to what extent
the rule contended for is applicable.

With respect to the sale, or mortgage, of ships at
sea, it has been held, (*Atkinson* v. *Maling*, 2 *Term Rep.*
462.) that the delivery of possession need not accompany
the deed of sale; as this would be to require an act of
which the performance would be impossible, but the
grand bill of sale must be delivered; and this is suffi-
cient, if the vendee take possession immediately on the
ship's arrival at home. So of an assignment of goods
at sea, the delivery of the bills of lading and endorse-
ment over of the policies of insurance, was held suffi-
cient; the vendor having, after this, no longer the *order*

*and disposition* of the goods. (*Brown* v. *Heathcote*, 1
*Atk.* 160.) But where the owner of certain vessels,
used only in navigating the river *Thames*, mortgaged
them, and after kept possession for three years, and
borrowed money upon the credit of being owner, they
were held liable to be sold under a commission of bank-
rupt against the mortgagor. (*Stephens* v. *Sole*, cited 1
*Atk.* 157.) The decisions of the cases of *Bucknal* v.
*Roiston*, Pr. Ch. 285. *Cadogan* v. *Kennet*, Cowp. 432.
*Haselinton* v. *Gill*, 3 *Term Rep.* 620. *n. Jarman* v. *Wool-
loton*, 3 *Term Rep.* 618. *Kidd* v. *Rawlinson*, 2 *Bos. &
Pull.* 59. *Hoffman* v. *Pitt*, 5 *Esp.* 22. and some others,
were on the ground, that the vendor might retain pos-
session, *consistently with the deed*, the trust appearing
on the face of the deeds, and the transactions being
evidently clear of fraud; and *Buller* (*N. P.* 258.) says,
" *but yet the donor continuing in possession is not, in all
cases, a mark of fraud; as where the donee lends his donor
money to buy goods, and at the same time takes a bill of
sale of them for securing the money;*" and so was the
case of *Maggott* v. *Mills*, 1 Ld. *Raym.* 286. and of
*Kidd* v. *Rawlinson*, before cited. Here the parties
were not, before the sale, in the situation of debtor and
creditor. [See 2 *Bos. & Pull.* 60.] Having shown, as
we imagine, the existence of the rule requiring that a
transfer of possession should accompany the deed of
sale of personal things, and that it is applicable to all
contracts of sale, where, from the situation of the
goods, an actual delivery is *not impracticable*, and where
the retaining possession by the vendor is *not fairly con-
sistent with the deed*, the contract having, clearly, *no
fraudulent operation*, we proceed to inquire whether as-
signments of *choses in action* are not comprehended
within the same rule; so far as it can be made to
operate, at once, on things in possession, and things
merely in action. And here it may be remarked, gene-
rally, that the terms *goods, chattels, effects*, comprehend

June, 1809.

Wood-
bridge
v.
Perkins.

*choses in action:* and it was so held in *Ford and Sheldon's* case, 12 *Co.* 1. and in *Ryall* v. *Rolle.* And in the statute respecting absconding debtors, it is declared " *that debts due to any such absent and absconding debtor shall be considered as his* effects." (*Stat. Conn.* tit. 14. c 3. s. 5.) The inference, therefore, must be, that a general rule respecting *goods, chattels, effects,* will, if restrained by no reason operative on the particular case, always extend to *choses in action.* Consequently, we observe, that, as in cases of the sale of goods, the vendee is not to permit the vendor to retain the control and disposition of the goods, so, by parity of reason, in assignments of *choses in action,* it is the duty of the assignee immediately to withdraw them from the control of the assignor ; that is to say, this act, to conclude creditors, must accompany and follow the deed of assignment. This is to be done by delivery to the assignee of the specialty, or written evidence of the debt, if such there be, and *notice to the debtor.* On this point, it is certain, that fraud can be as easily practised, the public may be as thoroughly blinded, and creditors as effectually lulled to security, by a secret assignment of debts, as by a sale of goods without transfer of possession. From principle no argument can be drawn to justify an assignment of debts without delivery of the writings, and notice to the debtor, which will not directly invalidate the rule deduced from the authorities we have before cited. And it is in vain to rely on technical distinctions founded on the supposed difference in nature between *choses in action* and things personal in possession. For where prevention or suppression of fraud is the object, courts have disregarded such distinctions, and have exercised much liberality both in the construction of statutes, and in decisions at common law. We rely not alone, however, on abstract principle. On this point the plaintiff's case is abundantly supported by authority. And, first, we will recur again to the case of *Twyne;* in which the

opinion of Lord *Coke* supports this, as well as the former part of our case. "*When* ANY GIFT *shall be to you in satisfaction of a debt, by one who is indebted to others also, let it be made in a public manner, and before the neighbours, and not in private, for secrecy is a mark of fraud.*" Surely, there may be a "gift" of debts as well as of goods; and such "gift" may be as well made *in private*, or without notice; and would, if known, as effectually destroy the donor's credit, and alarm his creditors, as a transfer of his goods to secure a favourite creditor. The opinion of Chief Baron *Parker*, in *Ryall v. Rolle*, 1 *Atk.* 177. is also in point. "*If a bond is assigned, the bond must be delivered, and notice must be given to the debtor;* BUT IN ASSIGNMENTS OF BOOK DEBTS, NOTICE ALONE IS SUFFICIENT, *because there can be no delivery, and such acts are equal to a delivery of goods which are capable of delivery.*" So 1 *Pow. on Mort.* 28. where, after mentioning the necessity, on an assignment of a bond, of a delivery of the bond, he says—"*Upon the same principle, debts mentioned in a schedule, though not capable of delivery, may likewise be assigned conditionally; but in such case, notice to the persons indebted seems to be indispensably necessary to protect the assignee,*" &c. The same principle is also found in the civil law. (*Domat,* vol. 1. b. 1. fol. 61.) "*Things incorporeal, such as an inheritance, a debt, or any other right, cannot properly be delivered, no more than touched; but the power of using them is in lieu of delivery. Thus the seller of a right of service does, as it were, deliver it, when he suffers the buyer to make use of it. Thus he who sells or transfers a debt, or any other right, gives to the buyer or assignee a kind of possession by the power which he gives them to exercise this right,* IN CAUSING THE TRANSFER TO BE INTIMATED IN THE DEBTOR, *who, after the said intimation cannot own any other master, or possessor of this right, but the assignee to whom it is transferred.*" While we are considering the general principles applicable to this case, it will be

June, 1809.

WOOD-
BRIDGE
v.
PERKINS.

proper to take notice of a position advanced by the counsel who argue in support of the motion, that " to vindicate the charge of fraudulent intent, it is necessary to make out that want of notice is fraud *per se*." This position is incorrect both in an abstract and a practical point of view. There is no necessary affinity between *fraudulent intent* and *want of notice*. Men may, and often do, act with honest intentions, both in a moral and a legal sense, and yet act secretly; on the contrary, one may act openly with very mischievous designs. But the observation can have no practical application to the questions which have been raised in this case. For though want of notice be not *necessarily* and *of itself* a fraud, yet the policy of the law may declare certain transactions to be fraudulent—that is, that such transactions shall be treated in the same manner as if the intentions of the parties were actually fraudulent, unless they are made known in a certain, prescribed manner. And for this purpose, the law may announce to the parties entering into a contract, that unless this contract is notified to a particular person, within a specified time, it shall be held to be a fraudulent contract; provided it is not shown from the contract itself, that it can have no such effects as might have resulted, had it been made with views actually fraudulent. So far as this, want of notice is fraud *per se;* or if the term *prima facie evidence* is more acceptable, we will grant it to be such, only. Such evidence is conclusive, until it is contradicted.

The remaining question is—whether the case now under consideration can justly be excepted from the general rule respecting the sale of goods and assignments of *choses in action*. The circumstance that notice was actually given, though not till two days after the plaintiffs' attachment, seems not to be relied on. And indeed had these plaintiffs attached goods in *Duryee's* store, and Messrs. *Waddington, &c.* having a bill of sale,

executed three months before, had contrived to get the goods out of the sheriff's hands, two days after the attachment, they might claim to hold them, by a transfer of possession, accompanying and following the deed of sale, with just as good grace, as they could now challenge this debt, by virtue of the notice. It is granted us, that *Perkins*, previous to his receiving notice, might safely have paid the debt to *Duryee*. It was, therefore, until that event, *Duryee's* debt; and, as such, it might be, and was, attached by *Tudor, Woodbridge & Co.* But a subsequent act of the assignees could not affect the rights of the attaching creditors. It is, however, objected, 1. That notice to the debtor constituted no part of the assignment; 2. That the property of the debt is transferred by the assignment itself; 3. If notice is a part of the contract, the assignee could not hold, until notice had been given, though there had been no neglect to give notice; 4. No act of ownership was exercised by *Duryee;* 5. No false credit is obtained by taking an assignment of a book debt, without giving notice; and giving notice does not prevent any person from being imposed upon.

To these objections we answer, 1. That after the execution of the deed of assignment, the transaction remained inchoate, until consummated by notice. The 2d objection is overthrown by another argument of the gentleman, *viz.* " that the object of notice is merely to prevent payment to the assignor;" for if the contract itself transferred the property of the debt, after the contract, the property of the debt no longer remained in *Duryee;* and payment could no more be made to him than to a stranger, who had never owned the debt. 3. We are not inquiring what length of time shall be allowed the assignee to give notice. Until notice, the assignee must run his own risk. 4. It does not appear that acts of ownership were, or were not, exercised by

*Duryee*. He could have exercised such acts by discharging or compounding the debt.  5. A fictitious show of credit can as easily be kept up by an assignment of a book debt, without notice, as by a sale of goods without transfer of possession ; and this is a very strong case to prove it.  *Tudor, Woodbridge & Co.* and *Perkins* resided in *Hartford; Duryee* in *New-York;* between them all there existed a constant intercourse of business. From the course of business *Tudor, Woodbridge & Co.* must have known, that *Duryee* had large sums due him in *Connecticut;* and they could not hesitate to trust him on the credit of these debts, especially as they were at all times liable to attachment.  Suppose, then, that *Perkins* had been duly notified of this assignment.  Can it be said, that *Tudor, Woodbridge & Co.* would not have discovered it?  The knowledge of such an event would never have been confined to *Perkins.  Duryee's* credit must have been instantly ruined; for no act could be more fatal to it than the assignment of his books to secure a creditor.  After this, would *Tudor, Woodbridge & Co.* have trusted him?  Or if they had already done it, would they have spared any exertion to obtain immediate security?  It cannot, then, be said, that such an assignment gives no false credit to the assignor; or that it does not expose other persons to imposition.

We need only add, in the words of Lord *Hardwicke*, ( 1 *Atk.* 185.) " that very great inconveniences may arise by giving an opportunity to people to make such securities, and yet appear to the world as if they had the ownership of all those goods of which they are in possession, when perhaps they have not a shilling of property in them."

By the Court.  Where there is an assignment of a book debt, until notice of this assignment is given to the debtor, he remains the debtor of the assignor, and

of course cannot be the debtor of the assignee; it being a rule of law, that where there is sale of personal property, the possession of such property must be changed from the vendor to the vendee, or it will be liable to the creditors of the vendor. So in the case of an assignment of a bond, or note of hand, there must be a delivery of the bond or note to the assignee, and notice of the assignment must be given to the obligor, or promissor; for, until that is done, the obligor or promissor remains a debtor to the obligee or promisee. And although there can be no delivery of a book debt to the assignee; yet all that can be done ought to be done. Notice, therefore, is indispensable; for until such notice is given, the assignor remains in full possession of the book debt; and his debtor is indebted to him, until he has notice of the equitable claim of the assignee. The court do not, therefore, advise a new trial.

New trial not to be granted.